**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

SHIRLEY A. BRITTON,

                Plaintiff,

                                                                      **Case No. 05-C-1232**

      -vs-

**JO ANNE B. BARNHART,
Commissioner of Social Security Administration,**

                Defendant.

---

## DECISION AND ORDER

---

This matter comes before the Court on Shirley Britton's ("Britton") appeal of the Social Security Commissioner's denial of her application for supplemental security income benefits. Britton initially filed her claim on November 6, 2000, which was denied following a hearing by Administrative Law Judge ("ALJ") Margaret J. O'Grady. Britton appealed, and Magistrate Judge Patricia Gorence remanded the case for further proceedings. On remand, the ALJ held another hearing and issued a second ruling denying benefits.

For the reasons that follow, the Commissioner's decision is affirmed.

### BACKGROUND

**I.    Diagnostic History**

Plaintiff has been obese her entire adult life. In 1984, she reduced her weight by 120 pounds through gastric bypass surgery, but eventually gained much of the weight back. Tr.202.

In 1996, plaintiff reported abnormal vaginal bleeding, and was scheduled for a hysterectomy. Plaintiff was also diagnosed with hepatitis B, so the surgery was delayed. The hysterectomy was eventually performed in 1997. Tr. 200, 206, 939-66.

Also in 1996, plaintiff began receiving treatment for back pain. She reported increasing back pain, increased bladder pressure and increased urinary frequency. She was prescribed Hydrocodone, a narcotic, for the pain. Tr. 219.

Plaintiff was treated at a pain clinic from May 16 to June 20, 1997. She reported that her "entire body hurts," including her neck, upper, mid and lower back, radiating to her legs and ankles. Plaintiff was scheduled for trigger point injections, psychological evaluation and prescribed Prozac and Trazodone. Tr. 236-37, 858.

On June 3, 1997 plaintiff was treated in an emergency room with left rib pain and received a prescription for Ultram. Tr. 933. She also received psychological treatment for depression and anxiety at United Behavioral Health between June 9 and July 14, 1997. Tr. 227-234. Between 1997 and 1999, she was variously prescribed Vicoprofen, Vicodin, and Motrin 800 for her pain, depression and fatigue. Tr. 264-289.

On April 12 and June 12, 2000, plaintiff saw Dr. Finnegan, who diagnosed a "major depressive episode overlying chronic fatigue and fibromyalgialike symptoms" and prescribed Prozac and Vicoprofen. Tr. 426, 424. In September 2000, plaintiff's low back pain was worse and she received an injection of Toradol as well as a prescription for Vioxx. Plaintiff returned to the doctor in October 2000, reporting that she had pain in her back, thighs, ankles,

-2-

heels and through most of her ribs. She was tearful and her physician referred her to a psychiatrist. Tr. 420, 421.

In an October 2000 visit, psychiatrist Dr. Stevens noted that her depression was a contributor to her chronic pain. Dr. Stevens also observed that plaintiff had a urine smell about her and assigned her a GAF (global assessment functioning) of 55 (which connotes "moderate impairment" under the DSM-IV). Dr. Stevens diagnosed chronic pain, depression and personality disorder, and referred plaintiff for psychotherapy. Tr. 420, 440-41.

In 2001, plaintiff continued to receive treatment for depression, anxiety, and chronic pain. On January 31, 2001, State Agency physician Baumblatt, M.D., reviewed plaintiff's medical history and concluded that plaintiff could perform light work, which may involve lifting up to 20 pounds occasionally and up to 10 pounds frequently, or minimal lifting along with a good deal of walking or standing, or sitting most of the time while operating hand or foot controls. Tr. 479-85; 20 C.F.R. § 416.967(b).

A February 5, 2001 evaluation of plaintiff's incontinence problems concluded that urinary issues were not the cause of her pain symptoms. Tr. 464. A rheumatology evaluation later that month noted that "her overall demeanor was depressed. She frequently spoke with her eyes closed." The doctor concluded that plaintiff had a chronic pain syndrome complicated by depression and chronic social anxiety and suspected osteoporosis. Tr. 517-19.

On February 13, 2001, State Agency psychologist Marva Dawkins reviewed the evidence of record and agreed that plaintiff did not meet any of the Listings for mental

impairments. Dr. Dawkins advised that plaintiff seemed capable of performing and sustaining simple, routine tasks. Tr. 544. Another State Agency psychologist, Anthony Matkom, also found that plaintiff could perform routine, unskilled work. Tr. 503.

In August 2001, plaintiff began seeing Dr. Braza, a physiatrist, with worsening low back pain and bilateral groin pain. Plaintiff was intermittently tearful throughout the examination and Dr. Braza opined that she "may require chronic pain management approach for management of depression, fatigability, decreased functional endurance, and evolving chronic pain syndrome." Tr. 678-81. She reported some depression, but did not want any anti-depressants because she thought it was likely she could overdose. Tr. 679. She had no muscle atrophy or reflex, sensory, or motor strength deficits. Tr. 680. After a follow-up visit, Dr. Braza recommended physical therapy, but reconsidered and recommended a medical reassessment after reviewing abnormal lab tests as well as x-rays which showed several rib fractures. Tr. 1130.

On August 21, 2001, Dr. Jankus examined plaintiff for her disability claim. Plaintiff reported that she had been diagnosed with fibromyalgia, but that this pain was something that she could deal with. Tr. 551. On examination, plaintiff did not have any tender points in her upper or lower extremities or neck. She had somewhat limited range of motion in her hips due to pain. She had full strength in her lower extremities, but was limited by discomfort around the hips and back. She had no reflex or sensory deficits. She had a suggestion of a mild gait abnormality on the left, but she could walk without a cane in the examination room briefly. She had no difficulty with grasping or manipulations. The doctor noted that

-4-

plaintiff's examination did not fit the diagnosis of fibromyalgia, as there were not multiple tender points, and that plaintiff appeared to have dealt with her depression. Tr. 553-54.

On September 5, 2001, Dr. McDermott, a State Agency Physician, reviewed the evidence of record and found that plaintiff could do light work and occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. 557-58. Dr. Culburtson, a State Agency psychologist, reviewed the evidence of record and advised that plaintiff did not meet any listed impairments. Tr. 564.

During the late summer and fall of 2001, plaintiff also received treatment for her pain at the Froedtert emergency room. On September 24, 2001, Dr. Dhariwal noted that plaintiff's bone scan revealed several areas of increased uptake among her ribs and that she had several old rib fractures. Dr. Dhariwal also noted degenerative joint disease of the sacroiliac joints, osteopenia, anemia, depression and abnormal liver tests. Even with all of these findings, he said the etiology of his back pain was not clear to him at that point. Tr. 1129, 1122.

In 2002 plaintiff's symptoms continued to worsen. On January 8, 2002, she was seen for progressively worsening pain and fatigue. On January 22, 2002, plaintiff saw Dr. Varma for evaluation of her chronic hepatitis B infection. She arrived at the appointment in a wheelchair and had difficulty ambulating or getting out of the wheelchair and onto the exam table. Plaintiff had multiple tender areas in the lower ribs on both sides consistent with a prior history of spontaneous fractures. Tr. 635-636. On February 8, 2002 plaintiff returned to the emergency room with rib and upper back pain. Tr. 895-904.

-5-

On February 13, 2002, plaintiff was evaluated by Dr. Reddy for a disability related consultation. Plaintiff was "emotionally labile and depressed. She broke down very easily and cried for a period of time when the examination was carried out. She appears to have moderate pain behaviors and moves in an extremely slow and guarded fashion. She walks with a limp on the left and has difficulty walking on her heels and toes." Tr. 711. Dr. Reddy concluded that plaintiff had severe features of fibromyalgia, fractured ribs bilaterally, and chronic pain syndrome associated with depression, sleep impairment, marked emotional lability and functional limitations. Tr. 712. Dr. Reddy concluded:

> Given these findings, I believe this person is unable to perform any competitive work. She is currently performing tasks in the sedentary category on an intermittent and as tolerated basis. She is currently managing pain with various medications including narcotics and Neurontin. Thus, I believe she is not capable of returning to any competitive work in the foreseeable future and for a minimum of twelve months.

Tr. 712.

On February 18, 2002, plaintiff was seen by Dr. Irene O'Shaughnessy, who finally diagnosed plaintiff with severe vitamin D deficiency. She prescribed 50,000 units of vitamin D per week for six weeks. Tr. 708. On April 8, 2002, plaintiff saw Dr. Rao, who found that "her back pain overall has gotten somewhat better" and advised against surgery or epidural blocks. Tr. 692. By May 6, 2002, plaintiff had made more progress, as she was able to walk in the house without a cane, ambulate up and down stairs, and was able to walk up to one block with a cane. Her shoulder, groin and rib pain had greatly improved, although she still had back pain and could stand for only 20 minutes. Blood drawn showed that plaintiff's 25-

hydroxy D level had increased from less than 1 to 12. Tr. 627. The normal range was between 15 and 57.

Plaintiff returned to Dr. O'Shaughnessy on August 5, 2002. She was still having back pain, but made further improvement in her musculoskeletal status and rarely needed to use a cane to walk. Plaintiff reported that she was active in her church and "generally feeling fairly well." In November 2002, plaintiff returned to Dr. Dhariwal who noted that her back pain and chronic fatigue were better than they had been a few months earlier. He recommended continued usage of Naproxen and to try to use not more than 30 Vicodin 5/500 tablets per month. Tr. 1103.

On November 25, 2002, plaintiff told Dr. Dhariwal that she was "doing remarkably well from her back pain point of view"; her fatigue had improved; and her depression was "remarkably better." She did not want to continue with the pain clinic and reported that she rarely took anything stronger than Naprosyn. Tr. 1103.

On September 3, 2003, Dr. Reddy completed a report based on his February 13, 2002 examination of plaintiff. He opined that plaintiff would be able to sit or stand less than two hours in an 8 hour work day, that she would frequently need to take unscheduled breaks, that she could lift less than 10 pounds occasionally, and that her pain and depression symptoms would frequently interfere with attention and concentration needed to perform even simple repetitive unskilled work. Based on this, he opined that plaintiff would be incapable of performing any competitive work. Tr. 1146-49.

-7-

On October 20 and November 10, 2004, Dr. Matusiak performed a psychological interview with plaintiff, based on a referral from her primary physician for evaluation of her depression and severe anxiety disorder. Plaintiff was still having back pain for which she was taking Methadone and Vicodin. Tr. 1151. Plaintiff reported that she was currently at peace with herself, but admitted that she could be happier. She said that she was stressed by bad attitudes of people around her and her inability to do things on her own. Dr. Matusiak diagnosed major depressive disorder, chronic; anxiety disorder and agoraphobia, pain disorder associated with both psychological factors and general medical condition. He strongly recommended she obtain comprehensive individual outpatient therapy which incorporated development of behavioral strategies for pain management and coping with the treatment agenda. Tr. 1150-54.

**II.      Hearing Testimony**

At the initial hearing in September 2002, plaintiff testified that her disability began in 1997 when she began to experience constant, intense pain, initially in her chest and later throughout her body. Tr. 32. Plaintiff testified that she washed dishes; washed, sorted and folded the laundry (although her children carried it up the stairs); swept (although she could not mop); made her bed; and went to Bible study on Wednesdays and Church on Sundays. Tr. 37-38. Although she still had significant pain, plaintiff was able to put on shoes and socks, get into the bath tub and make it to the bathroom without urinating on herself. Tr. 32-33. If she had been standing for 20 minutes or longer or walking, she needed to sit down to relieve the pain. She used a heating pad for her back. Tr. 35.

In addition to Vitamin D doses, plaintiff testified that she used all of the following medications: Naproxen, Vicodin, Klonopin, Cyclobenzaprine, Neurontin, Skelaxin, Rocaltrol, Prilosec, and Calcium carbonate. Tr. 36. Plaintiff rarely went to the store, did not drive, and last went to church bingo three years before the hearing. Tr. 38. Britton could lift nothing heavier than a gallon of milk, which she used both hands to carry. Tr. 40

Plaintiff's husband testified at the initial hearing that, until a few months before the hearing, he brought a pail into the bedroom at night because she was not able to get to the bathroom in time. Tr. 46. He explained that plaintiff spent most of her time sitting and complaining of being in pain, and that because of her pain, they have only had sex four or five times in four years. Tr. 44-46. Plaintiff's eleven-year-old daughter testified that plaintiff essentially did nothing because she was in pain and had not attended her fifth grade graduation two years prior because she would have to climb seven flights of stairs and was not sure she could make it to the bathroom in time. Tr. 49.

At the November 2004 hearing, plaintiff testified that her pain increased with stress, and that she could become stressed if her husband looked at her the wrong way or used the wrong tone of voice. Tr. 750. She said she could only do part of the dishes. Tr. 754. Plaintiff reported that she had started seeing a psychiatrist in October 2004, but had not had any other psychiatric treatment since the treatment she had had prior to her first hearing. Tr. 760. Plaintiff testified that "fear dominates my life," and she was afraid to do anything she believed would cause her pain. Tr. 753. She described a "constant cycle" of stressful situations leading to pain, resulting in more stressful situations. Tr. 752.

-9-

### III. Vocational Expert Testimony

At the November 2004 hearing, the VE testified that, if plaintiff were limited to routine, repetitive light work with simple, non-complex instructions and occasional climbing, stooping, kneeling, crawling, balancing and crouching, she could do tens of thousands of jobs in retail sales, as a cashier, in assembly, in production, and in security. Tr. 760-64. She testified that, based on her experience, the majority of the assembly, production, office, and security jobs would be full-time; the cashier and sales jobs could be a combination of full and part-time jobs. Tr. 780. The VE provided the census codes for the jobs she identified and explained how she had used various resources, which she brought with her to the hearing, to arrive at the number of jobs she identified. Tr. 775-800.

## ANALYSIS

The ALJ found that plaintiff was not disabled because she retained the residual functional capacity (RFC) to perform a significant number of jobs in the economy. Section 205(g) of the Social Security Act limits the scope of judicial review of the Commissioner's final determination, and provides that the findings of the Commissioner as to any fact shall be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). A court may reverse the Commissioner when the ALJ's decision is not supported by substantial evidence or is based on legal error. *See Eads v. Secretary of Dep't of Health and Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

**I.    Credibility Determinations**

Plaintiff challenges the ALJ's credibility determination with respect to her testimony about her symptoms and their effects.  Ruling 96-7p requires the ALJ to consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate or aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment other than medication the person receives for pain or other symptoms; (6) any measures other than treatment the person has used to relieve pain; and (7) any other factors concerning the person's functional limitations and restrictions due to pain or other symptoms.   Generally, the Court will defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing.  *See Elbert v. Barnhart*, 335 F. Supp. 2d 892, 909 (E.D. Wis. 2004).  Accordingly, the ALJ's credibility findings will not be overturned unless they are "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

While the evidence of record demonstrates that plaintiff's symptoms were severe, the ALJ's credibility determination and overall finding on disability is supported by substantial evidence in the record.  The ALJ found that, while the plaintiff was suffering from some degree of pain, the clinical findings, test results, and plaintiff's everyday capabilities did not support her assertion that she could not sustain any level of full-time employment. Tr. 738. The ALJ also noted the discrepancy between plaintiff's testimony at the first hearing, wherein she stated that she performed household chores regularly and attended church and

bible study, with her testimony at the second hearing, wherein she stated that she was very limited and incapable of performing even low stress jobs. Compare Tr. 741, 37-38. This discrepancy supports the ALJ's credibility finding, especially in light of the fact that the evidence of record indicates that plaintiff's condition vastly improved following her Vitamin D dosage therapy.

Plaintiff also argues that a remand is required for the ALJ to give the testimony of plaintiff's husband and daughter a proper credibility determination. This testimony is essentially corroborative of plaintiff's subjective complaints. Therefore, it is not entitled to a separate credibility determination. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996).

## II.   Treating Source Statements

Plaintiff argues that the ALJ improperly failed to give the opinions of her treating physicians proper weight, particularly the February 13, 2002 evaluation of Dr. Reddy. Dr. Reddy opined that plaintiff "is unable to perform any competitive work. She is currently performing tasks in the sedentary category on an intermittent and as tolerated basis." Tr. 712. On September 30, 2003, Dr. Reddy concluded that plaintiff could sit or stand less than two hours in an eight hour day, would frequently need to take unscheduled breaks, could lift only less than 10 pounds on an occasional basis, and was incapable of competitive work. Tr. 1146-49.

The ALJ refused to adopt Dr. Reddy's opinion because she found it "inconsistent with restrictions placed on the claimant by other treating sources." Plaintiff finds this improper because the cited inconsistencies are from the time period after her Vitamin D deficiency was

-12-

discovered and treated. Yet this is exactly the point – the ALJ found that Dr. Reddy's opinion did not consider this improvement, so she found that his ultimate conclusion about plaintiff's limitations was not persuasive. Tr. 740.

In the alternative, plaintiff argues that the ALJ should have adopted Dr. Reddy's opinion from the onset of her claim (in 2000) until February 13, 2002, the date Dr. Reddy examined her, for a closed period of disability. However, the Social Security Act requires that the claimant have a disability that has lasted for at least 12 months for a successful disability claim. *See* 42 U.S.C. § 1382c(a)(3)(A). There is substantial evidence in the record to support the conclusion that the disability onset date did not occur until August 2001, when plaintiff's condition substantially worsened. This onset date is less than 12 months prior to May 2002, when plaintiff's condition drastically improved following Vitamin D therapy.

Moreover, Dr. Reddy's opinion is not necessarily entitled to the same deference as that of a treating physician, because he only treated her once. Under the applicable regulations, a treating source is one who has seen the claimant "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required" for the condition. *See* 20 C.F.R. § 416.902. Dr. Reddy did not have an ongoing treatment relationship with the plaintiff, so his opinion is entitled to no more deference than any other physician who reviewed plaintiff's medical records.

### III. Assessment of Psychiatric Impairments

Plaintiff argues that the ALJ committed legal error by failing to obtain the required medical opinions on her psychiatric impairments. However, the ALJ expressly relied on the

-13-

opinions of a variety of state agency psychological opinions, all of whom concluded that plaintiff retained the mental residual functional capacity to do light work. Tr. 739. Plaintiff also takes issue with the ALJ's failure to explicitly address whether her impairments qualify as listed impairments. However, the state agency psychologists relied upon by the ALJ concluded that plaintiff's impairments did not meet the relevant listings. Tr. 503, 544. Accordingly, the Court finds that the ALJ did not commit legal error, and the ALJ's RFC finding with respect to mental impairment is supported by substantial evidence.

## IV.     Physical RFC Assessment

Plaintiff argues that the ALJ failed to properly evaluate the testimony, failed to properly evaluate treating source statements, and did not properly consider the entire record, such as her use of strong pain medications. The Court disagrees. The ALJ's RFC findings were not flawed and were supported by substantial evidence.

More specifically, plaintiff argues that the ALJ failed to engage in a "function-by-function" RFC assessment as required by SSR 96-8p. Nothing about SSR 96-8p requires the ALJ to articulate her findings under each function. Moreover, the ALJ once again relied on the opinions of State Agency physicians, who did a function-by-function analysis of plaintiff's abilities. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (by adopting the opinion of State Agency physician who factored in obesity, the ALJ factored this impairment into his decision indirectly).

-14-

## V. Testimony of VE at November 2004 Hearing

At the November 2004 hearing, the VE testified that a hypothetical individual of plaintiff's age, education and experience who was capable of light work with limitations of occasional "climbing, stooping, kneeling, balancing, and crouching; able to perform routine repetitive work; follow simple instructions," (Tr. 761) would be capable of performing 4,000 retail sales jobs; 17,000 cashier jobs; 2,500 assembly jobs; 15,000 productions jobs; 4,500 office clerk jobs; and 3,100 security guard jobs. Tr. 763-64. The raw numbers were pared down a bit when the VE eliminated public contact and limited interaction with coworkers. Tr. 766.

At step 5 of the sequential process, it is the Commissioner's burden to establish the existence of a significant number of jobs that the claimant can perform. *See McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2003). When questioned how many of the jobs were full-time and how many were part-time, the VE admitted they included both and stated that she had no way of "discerning that from the record that I have." Tr. 769-70, 775. However, the VE clarified that, based on her experience, the majority of the assembly production, office and security jobs would be full-time, and the number of cashier and sales jobs identified would be a combination of full-time and part-time positions. Tr. 780. Plaintiff's counsel then requested free copies of the reports, source documents or notes the VE used to reach her conclusions, but these requests were denied. Tr. 776-786, 788, 802.

While the VE is "'free to give a bottom line,' . . . the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of

-15-

the vocational expert's opinions." *McKinnie*, 368 F.3d at 911. Here, the information was available on demand because the VE brought the vocational resources that the she consulted with her to the hearing. Tr. 797. The VE also provided the reference codes she used in her analysis, explaining how counsel could use those codes to trace her research. *McKinnie* is distinguishable because the VE "had not prepared a written report for the hearing, nor did she have any reference materials with her." *McKinnie*, 368 F.3d at 909. Moreover, the VE in *McKinnie* "could provide no data or citations for the references she relied upon in forming her opinion," and when the claimant's attorney asked that the expert supplement the record, the ALJ ruled that the claimant must compensate the VE for her time. *Id. McKinnie* does not mandate that the Commissioner provide free copies of reference source materials when the materials are available on demand to the plaintiff through other means. Accordingly, the Commissioner's RFC finding was supported by substantial evidence and will be affirmed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Plaintiff's appeal is **DENIED**; and

2. The Commissioner's decision is **AFFIRMED**.

Dated at Milwaukee, Wisconsin, this 30th day of January, 2007.

**SO ORDERED,**

**s/ Rudolph T. Randa
HON. RUDOLPH T. RANDA
Chief Judge**